**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **CHRIS C. WOOD, D/B/A CCW ELECTRIC** | **PLAINTIFF/COUNTER-DEFENDANT** |
| **vs.** | **CIVIL ACTION No.: 3:22-CV-607-HTW-LGI** |
| **STUART C. IRBY CO., INC.** | **DEFENDANT/COUNTER-PLAINTIFF** |

## ORDER

BEFORE THIS COURT are the following: [Docket 69], a motion for summary judgment by Defendant and Counter-Plaintiff Stuart C. Irby Company ("Irby" or "Defendant"); [Docket 71 *as amended by* Docket 156], a motion for partial summary judgment by Plaintiff and Counter-Defendant Chris C. Wood, d/b/a CCW Electric ("Wood" or "Plaintiff"); and [Dockets 90, 92, 94, 96, 98, 100, 102, 104, 106, 108, 110, 112], Irby's motions *in limine*. Each motion stands contested.

## I.  BACKGROUND

Wood is a self-employed electrical contractor in the State of Oklahoma who does business as CCW Electric. Irby is a distributor of electrical equipment and parts. Wood submitted a credit application to establish an "open account"[1] with Irby, first in 2009, and again in 2014. This allowed Wood to make multiple purchases of goods from Irby without contemporaneous payment.

---

[1] An "open account" in this context refers to a business arrangement between a supplier and customer where the customer has a line of credit with the supplier which can be applied towards purchases. *See Tommy Brooks Oil Co. v. Wilburn*, 384 So. 3d 1212, 1220 (Miss. 2024) ("An open account is a type of credit extended through an advance agreement by a seller to a buyer which permits the buyer to make purchases without a note of security and is based on an evaluation of the buyer's credit. Generally, it is an account based on continuing transactions between the parties which have not been closed or settled but are kept open in anticipation of further transactions." (internal quotations and citations omitted)).

These purchases would be memorialized with itemized invoices.  Wood would apply credit to his account for payment by furnishing checks to Irby.

Wood frequently handled electrical work on commercial building and renovation jobsites as a subcontractor.  His necessary electrical parts and fixtures often would be determined by engineers and architects and communicated to a general contractor.  Then, electrical distributors, such as Irby, would bid to supply the requisite materials.  Rather than purchasing the materials directly from the electrical distributors, the general contractor would sometimes delegate the purchase to Wood.  Wood would provide the check to Irby for the materials.  At times, the check would be a "joint check" written by the general contractor.  Other times, Wood would seek to be reimbursed, or he would be paid for his work in excess of his expenditure.

Because of this attenuated process and the quasi-fungible nature of the open account, various issues plagued Wood and Irby's relationship.   Wood and Irby have laid late fees, underpayments, overpayments, inconsistent exemptions from sales tax, late deliveries, incorrect or defective goods, and disputed returns on the courthouse steps in this matter.

Wood now sues Irby for "breach of contract," "unjust enrichment / constructive trust," and "promissory estoppel."  Firstly, Wood alleges that Irby failed to credit plaintiff a promised sum of $27,885.75 to compensate Wood for some delayed and errant deliveries.   Secondly, Wood complains that Irby withheld a refund on unneeded, "surplus equipment" that was returned to Irby. Wood claims that the returned equipment is worth between $16,708.39 and $42,053.49.  Wood's complaint seeks compensatory damages for these sums.  Additionally, Wood wants an accounting of the surplus equipment; punitive damages; and interest and costs, including attorney fees.

Irby has counterclaimed, suing Wood for "breach of contract" and "breach of personal guaranty."  Irby alleges that Wood failed to pay for materials he purchased in 2021.  Irby says that

the principal due is $5,892.43, but that Wood also owes Irby various "service charges" (late fees); attorney fees; and other costs associated with collecting the amounts owed, as well as interest.

## II.   DISCUSSION

### A.  Subject-Matter Jurisdiction and Choice of Law

"[F]ederal courts are courts of limited jurisdiction, having only the authority endowed by the Constitution and that conferred by Congress." *Halmekangas v. State Farm Fire & Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010) (quoting *Epps v. Bexar–Medina–Atascosa Counties Water Improvement Dist. No. 1*, 665 F.2d 594, 595 (5th Cir.1982)) (internal quotations omitted); *see also* U.S. CONST. art. 3, § 2.  "Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).[2]  "A federal district court may exercise original jurisdiction over any civil action that either satisfies diversity requirements[,] or that arises under the federal constitution, statutes, or treaties—commonly referred to as 'federal question' jurisdiction." *Energy Mgmt. Servs., LLC v. City of Alexandria*, 739 F.3d 255, 258–59 (5th Cir. 2014) (citing 28 U.S.C. §§ 1331, 1332, 1369).

As to "diversity" jurisdiction, "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States." 28 U.S.C. § 1332(a).  Under diversity, federal courts apply substantive law of the forum state, here Mississippi's, and federal procedural law.  *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008) (citing *Gasperini v. Ctr.*

---

[2] Courts may also exercise their discretion to drop non-indispensable parties to perfect diversity of citizenship.  *Ray v. Bird & Son & Asset Realization Co.*, 519 F.2d 1081, 1082 (5th Cir. 1975).

*For Humanities*, Inc., 518 U.S. 415, 426–27 (1996)).  "The Federal Rules of Evidence … govern the admissibility of evidence in diversity cases." *Reed v. Gen. Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985) (citing Fed. R. Evid. 1101(b); *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 821–22 (5th Cir.1980)).

Wood originally filed suit in an Oklahoma state court.  Irby then removed the case to federal court in the Western District of Oklahoma, invoking diversity jurisdiction under 28 U.S.C. § 1332(a).[3]  Wood subsequently moved to remand the case to state court, and Judge Scott L. Palk denied the motion.[4]  Wood had "conced[ed] that the parties are completely diverse[.]"  [Docket 9] at 1.  This Court finds that the parties, indeed, are diverse, per the pleadings and Irby's Notice of Removal.  Irby is a Mississippi Corporation with its principal place of business in Mississippi and

---

[3] "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1446(a).

[4] After surviving Wood's motion to remand, Irby moved to transfer the case to this Court pursuant to a purported forum-selection clause.  Wood did not oppose, and Judge Palk granted the motion.

Because of the "forum-defendant" rule, had Wood filed in Mississippi state court, Irby would not have been permitted to remove the case to this Court.  *See* 28 U.S.C. § 1441(b)(2) ("A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.").  Wood's choice to originally file in Oklahoma state court provided Irby the opportunity to litigate his suit in this Court.

This Court need not decide whether the forum-defendant rule renders this transfer improper, because (1) Wood never raised this issue and (2) this unusual result does not endanger this Court's jurisdiction.  Fifth Circuit law is clear that the forum-defendant rule is a non-jurisdictional procedural rule.  *In re 1994 Exxon Chem. Fire*, 558 F.3d 378, 395–96 (5th Cir. 2009).  Thus, even "where there is improper removal, the pertinent question is whether the removed action could have been filed originally in federal court[.]" *Id.* at 395.  If so, "and the action has proceeded to judgment on the merits in federal court, that judgment will *not* be disturbed." *Id.*  The parties have litigated before this Court for nearly two years, completed discovery, and briefed dispositive motions and motions *in limine*.  This Court finds it is appropriate for it to rule on the merits.

Wood is a citizen of Oklahoma and does business as CCW Electric in Oklahoma.[5]  Wood, though, contested whether the amount in controversy exceeds $75,000, exclusive of interest and costs.

Judge Palk found that Irby had "established jurisdictional facts demonstrating [that] the amount in controversy … plausibly [may] exceed the jurisdictional limit of $75,000."  [Docket 9] at 2 (Judge Palk earlier indicated he was applying the "preponderance of the evidence" standard of proof).  Judge Palk summed the upper range of Wood's estimated damages regarding the returned surplus equipment, $42,053.59, and Wood's claim for an unpaid credit of $27,885.75 to determine that Wood's alleged compensatory damages were about $70,000.  Judge Palk pointed out that attorney fees, which were statutorily available under Oklahoma law, would cause the amount in controversy to exceed the jurisdictional minimum.  While Mississippi law now governs the damages available to Wood in this case, and while some claims for damages have since been abandoned, "subject-matter jurisdiction 'depends on the state of things at the time of the action brought.'"  *Calogero v. Shows, Cali & Walsh, L.L.P.*, 95 F.4th 951, 959 (5th Cir. 2024) (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)).  This Court finds Judge Palk's adjudication on this issue reasonable and consistent with Fifth Circuit law and Wood's complaint.

This Court is presently satisfied that it has diversity subject-matter jurisdiction per 28 U.S.C. § 1332(a).  <u>This Court, desirous of hearing from the parties on this issue, invites them to submit three-page letter briefs within two weeks of the entry of this order, detailing any objection</u>

---

[5] 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business"); *Alston v. Prairie Farms Dairy, Inc.*, No. 418-CV-157-DMB-JMY, 2018 WL 11270947, at *2 (N.D. Miss. Oct. 24, 2018) ("Case law suggests that the citizenship of a sole proprietorship for diversity purposes is determined by the citizenship of its members and/or owners.").

regarding subject-matter jurisdiction for this Court's consideration, so that any and all jurisdictional issues may be resolved before trial.

**B. Summary Judgment**

1. Legal Standards

This Court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court's job is not "to weigh the evidence and determine the truth of the matter[,] but to determine whether there is a genuine issue for trial." *Id.* at 249. A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. This Court views "the evidence in the light most favorable to the nonmoving party." *Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 697 (5th Cir. 2024).

2. [Docket 69] Irby's Motion for Summary Judgment

Irby moves for complete summary judgment, asking this Court to dismiss Wood's claims against Irby in their entirety and to enter judgment in Irby's favor on Irby's counterclaims. Because of the overlap in issues between the many motions and filings on the record, this Court has endeavored to consider all the parties' arguments and evidence where appropriate.

   a. *Irby's Counterclaims.*

Irby set out evidence that Wood was invoiced for materials in 2021 and did not pay for them. Irby submitted the initial credit application[6] establishing an open account between Irby and

---

[6] The initial credit application was in 2009. Wood pointed out that he signed a new credit application in 2014, although the parties dispute why this was necessary. In general, this Court refers to the more recent credit application.

Wood and Wood's personal guaranty.  Irby also submitted admissions by Wood of the validity of the contract between Irby and Wood, receipt of most of the goods at issue, and that Irby is entitled to most of the $5,892.43 principal.  Irby also submitted purported "sales terms"—that it contends are part of the agreement between Irby and Wood—that provide for a monthly service charge and payment for costs of collection, including attorney fees.

Wood consistently has acknowledged some liability as to the unpaid invoices.  Wood has not admitted that he owes Irby for three of the invoices of which he contests the authenticity, but, "for the purposes of [Irby's] Motion [for Summary Judgment]," Wood agreed to assume all the invoices are "legitimate."  [Docket 76] at 20 n.2.  "Wood acknowledges that Irby is entitled to a base summary judgment," but not the entire principal.  *Id.*  Wood contests $203.25 of the principal as "improperly assessed sales taxes (on a Western Heights project that Irby unquestionably knows is tax exempt)."  *Id.*  Wood also claims that he is "entitled to credits and damages that will easily cover/offset the underlying $5,700 principal," both from his own claims in this suit, as well as from "$7,000 in unapplied payments and improperly assessed and collected sales taxes."  *Id.*

Essentially, Wood argues that this case will result in a vindication of his claim that Irby owes Wood more than he owes Irby.  Thus, because the parties had an open account, Wood says he would not have to pay Irby—rather, the amount he owes of the principal would simply reduce his own recovery.  By that same logic, Wood argues that attorney fees and service charges are inappropriate—if he had been properly credited for his returned goods, his account would not have entered a negative balance to which late fees and collections costs would apply.

As set forth in greater detail below, material disputes of fact exist regarding whether Wood was entitled to credit for his return of the surplus equipment.  As above mentioned, Wood claims the value of that surplus equipment far exceeds Irby's claim for the $5,892.43 principal.  Wood

estimates he returned the surplus equipment around March 2021, while the invoices Irby claims went unpaid ranged from January through August 2021—thus, Wood's claim of entitlement to a credit on returned goods could predate any collection costs and many of the late fees to which Irby claims to be entitled.

Wood also provided evidence to create genuine disputes of material fact as to whether Irby owed him on improperly applied sales taxes and underapplied checks: Wood has submitted email correspondence with Irby during which Wood submitted "tax letters." These letters, seemingly from contractors who have retained Wood for electrical work, purportedly permit Wood to acquire equipment and materials tax-free because Wood was purchasing them for the benefit of the tax-exempt, school jobsites at which he worked.   Wood filed invoices in which Irby, nevertheless, charged him sales tax on orders related to those jobs.   Irby responds by claiming that Wood did not prove that he was statutorily exempt from sales tax.   Irby argues that Wood's letters and emails are not authenticated and hearsay and that the Oklahoma Tax Commission was not the sender. Letters and emails, however, have intrinsic evidence of authenticity (signature blocks, letterhead, etc.) and could properly be authenticated by a sponsoring witness at trial.   The letters and emails may also be admitted for non-hearsay purposes, such as Irby's statements and/or proof of notice to Irby that sales tax should be exempted.   Ultimately, Irby has not shown that this evidence "cannot be presented in a form that would be admissible in evidence."   Fed. R. Civ. P. 56(c)(2). Irby also attempts to shift focus away from itself, arguing that Wood's fight is with the Oklahoma Tax Commission.   It is clear from the emails, though, that Irby solicited evidence of tax-exempt status from Wood.

Wood also submitted an accounting purporting to show discrepancies between the amount Wood paid Irby by check to resolve account balances and how much of the check that Irby applied

to those balances.  Wood supports this accounting by attaching copies of Irby's invoices in which Irby notates which check is being applied to settle that invoice.  Wood collects the invoices referencing each check and purports to show that they do not add up to the total amount Wood paid.  Irby argues that Wood's interpretation of these invoices is speculation based on inadmissible hearsay.  Wood, however, appears to be interpreting the notes exactly as written.  *See, e.g.* [Docket 71-13] at 1 ("Paid 06/26/18 Check# 3001 $5187.92. Applied $1872.33 to this order").  Further, these appear to be statements of an opposing party and business records—so they are likely not inadmissible hearsay.[7]

Irby argues that the amounts remaining on the checks were perhaps applied to charges predating the ones Wood requested during discovery (starting in 2018), pointing to a declaration of an Irby employee, Thomas Box, summarily claiming all of Wood's checks were duly applied to his balance.  In support, Irby provides a spreadsheet, endorsed by Mr. Box, purportedly showing the transactions on Wood's account.  According to this spreadsheet, Wood's checks reduced Wood's running balance by the check amount, and the ultimate balance by the last of Wood's payments was "5,892.43," matching Irby's purported principal.  This spreadsheet, however, also suffers from not including detail before 2018.  Indeed, Wood obtained the testimony of an Irby credit analyst who affirmed it is "possible that Wood's account still has money hanging out there that hasn't been applied to any invoices" and that checks being improperly applied "generally happen[s]" on Irby accounts.  [Docket 71-6] at 150–53.  According to the parties' proposed pretrial order, Irby "will" call Thomas Box at trial, and his averments may be explored.

---

[7] *See* Fed. R. Evid. 801(d)(2) (A statement "offered against an opposing party and: … [which] was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay.); Fed. R. Evid. 803(6) (Records "kept in the course of a regularly conducted activity of a business," which meet certain conditions, are not excluded by the rule against hearsay.).

While perhaps lopsided, when viewing the evidence in the light most favorable to Wood, and resolving inferences in his favor, these disputes regarding improperly assessed taxes and underapplied payments survive summary judgment and pass to the factfinder.

As to both the tax and underapplied check allegations, Irby argues that Wood cannot recover because he did not plead them as claims in his Complaint. Wood did plead an affirmative defense to Irby's counterclaims alleging Wood "is entitled to a set off of the amount owed by [Wood] to [Irby] versus the amount owed by [Irby] to [Wood]." [Docket 6] at 3. So, while Wood would likely not be able affirmatively to seek damages based on these alleged claims or use them to recover greater than what he is owed on his complaint, he could pursue them as a "set-off"/"offset" and/or "recoupment" of the damages that Irby seeks against Wood.[8] Wood gave Irby notice of this theory by way of an amended initial disclosure:

> [Wood] disputes [Irby's damages calculation] as it fails to take into account improperly assessed service charges, sales tax, double payments on items, unapplied monies from Wood's checks, charges for rejected and returned goods. Wood is entitled to set-off for the value of the returned surplus materials against the remaining balance on Wood's account (if any) and thereby renders Irby's effective damages to $0.00.

[Docket 69-7] at 4.

The Mississippi Supreme Court has held that a "set-off" pled as an "affirmative defense" could survive summary judgment where it "create[ed] a genuine issue of material fact." *Lovett v. Anderson*, 573 So. 2d 758, 760 (Miss. 1990). Whether a party has proven it is "entitled to any

---

[8] Generally, "[s]etoff is a demand asserted to diminish or extinguish a plaintiff's demand that arises out of a transaction different from the one on which the plaintiff has sued," while "[r]ecoupment is a demand arising out of the same transaction as the plaintiff's claim." *BFI Waste Servs., LLC v. Harrison Cnty. Util. Auth.*, No. 1:08-CV-27-LG-RHW, 2008 WL 2065892, at *1 (S.D. Miss. May 13, 2008) (citing *Hunt v. Bankers Trust Co.*, 689 F.Supp. 666, 672 (N.D. Tex. 1987) (citing J. MOORE, 3 *Moore's Federal Practice* ¶ 13.02 (2d ed.1985))).

diminution of amounts due" to a claimant based on "affirmative defenses includ[ing] certain setoffs" is a "finding of fact." *Universal Computer Servs., Inc. v. Lyall*, 464 So. 2d 69, 76 (Miss. 1985). Therefore, because Wood has shown a material dispute of fact as to whether and to what degree he is due payment to Irby for any or all of its purported counterclaim damages or responsible for causing any harm as a result of the alleged breaches, this Court **denies** Irby's motion for summary judgment on its counterclaims. This Court is open to a stipulation or instruction to be read to the jury regarding the concessions Wood has made regarding the predicate elements of these counterclaims.

    *b. Wood's Claims.*

**Paid Credits.** Irby argues that Wood has effectively abandoned his claim for $27,885.75 in credits. Irby submitted invoice credit memos dated between August and October 2021 that show Irby paid Wood three disbursements summing to $27,885.75. [Docket 69-6]. Previously, an Irby employee had emailed Wood that the sum would be credited to Wood by the end of 2021. [Docket 75-3]. Wood also testified at deposition that he acknowledges this sum was paid—albeit as a "removal of charges" rather than as a credit. [Docket 69-8] at 36–37, 137–38. Wood also omitted this claim from his damages itemizations in amended initial disclosures and an interrogatory response. *See* [Dockets 69-7, 69-10]. In Wood's opposition brief, Wood is silent as to this claim and does not dispute Irby's contentions. Therefore, this Court agrees that Wood implicitly abandoned his claim for $27,885.75 of promised, unpaid credit, and other damages related to this claim, and that Irby has affirmatively proven that judgment as a matter of law is appropriate. This Court **grants** summary judgment, dismissing this claim.

**Surplus Equipment.** Per Wood's evidence, in 2018, he was hired as a subcontractor at a jobsite related to the Western Heights STEAM Academy in Oklahoma, his biggest ever commercial job. Wood's understanding was that "Irby independently obtained the [specifications]

and the plans from the general contractor and the architect, so providing [the necessary gear and materials] was [Irby's] responsibility" and "[Wood's] responsibility was to coordinate and install" the electrical materials.  [Docket 69-8] at 142.  Wood purchased the equipment Irby provided.

Because Wood was not familiar with part numbers, he did not realize that some of the gear—the surplus equipment—was not needed for the project until he was already installing equipment in 2020.  Wood messaged his contacts at Irby, Matthew Henderson and Walter Whitehead, in a "group text," asking about some of the equipment.  At first, Irby seemed keen on receiving back the incorrect equipment, stating it would "need to pick up the 3 other disconnects to credit."  [Docket 1-1] at 13.  Wood stated that "someone can come and get them," and requested "a return sheet."  *Id.*  Wood then confirmed that he wanted a return if the equipment was "in fact extra and can[']t be found on [the] plans[.]"  Irby confirmed it was "looking at [the] wrong set" and some of the equipment was supposed to be for a different application.  *Id.* at 14.  Wood pointed out other equipment was similarly "not needed and can be returned as well."  *Id.* at 15.  Wood decided to hold on to the equipment for more time to determine if it would eventually be needed.

In December 2020, Michele Welch, Wood's wife, sent an email to an Irby employee on behalf of CCW, writing:

> … I have a check# 3628 in the mail today, for $17,005.77, with a marked statement sheet. … Also, I have extra gear, parts that is not even on the project plans, not sure why these items are there. I will need these parts credited as well. My guys will take them to irbys warehouse some time this week. …

[Docket 75-2] at 3.  The Irby employee simply responded, "Thank you so much, please send me a copy of the statement so I will have it when the check arrives and can get the check posted correctly."  *Id.* at 2.  Wood had some of his crew ("J.D. and Blake") bring the items to Irby's Oklahoma City location in March 2021.  In June 2021, Michele again emailed the Irby employee:

> I am reaching out about the credits of all the extra gear on Steam Academy. The items were dropped off about a month ago at the okc location, none of this gear was on the plans, not sure why it was even sent out. … Please credit account balance, Walter is handling the gear credits here at this location.

*Id.* at 2.  The Irby employee referred the matter to another then-Irby-employee, Walter Whitehead, who responded:

> … As for finishing up the STEAM job and any other remaining balances on your account, I am working to get an understanding of what all has happened over the last few years and what is left to deal with. Once I can get my head wrapped around all of it, I will let you know what our plan is to close this all out. I hope to have this done by the end of this month, so we can all move on. …

*Id.* at 1.  Then, in August 2021, Whitehead wrote to Wood:

> … As for the material that you returned on the gear portion, we will not be crediting that to your account, this will aide in our recovery, and hopefully you are fine with that, let me know if that is an issue and we can discuss further. …

[Docket 75-3].  Wood was not credited nor reimbursed for the surplus equipment.

**Returnability of Goods.**  Irby's primary argument to defend against Wood's breach of contract claim is that there is no enforceable agreement requiring Irby to issue credit for returned equipment.  Initially, this Court notes that this premise depends on a finding of fact as to what Wood and Irby's agreement even comprised.  Under Irby's perspective, Irby was responsible for supplying the goods listed in the invoice; Irby did so, and Wood paid for and accepted delivery of the goods.  Under Wood's perspective, however, Irby had control and knowledge of what should have been provided to Wood; Irby was responsible for providing the proper goods for the job, and did not, constituting a breach of contract and justifying a reversal of Wood's payment.  Viewing the dispute through this lens, the Uniform Commercial Code ("the UCC"), which was adopted in

Mississippi, may apply.[9]  Specifically, under the so-called "Perfect Tender Rule," Wood had the right to "reject" any "goods [that] fail in any respect to conform to the contract."  Miss. Code Ann. § 75-2-601.  Wood would still need to demonstrate he rejected the goods "within a reasonable time after their delivery or tender" and that he "reasonably notifie[d]" Irby of the rejection.  § 75-2-602. Irby would also be able to argue that Wood accepted the goods despite non-conformity.[10]  Each of these factors is subject to a material dispute based on the record.

The UCC also provides for "contractual modification or limitation of remedy," including permitting parties to agree to "limi[t] the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts[.]" § 75-2-719(1)(a). Irby specifically argues here that the contract rules out Wood's ability to return the surplus equipment.  The sales terms that Irby attached to its counterclaim state:

> Returns.  Orders that were factory special orders or otherwise fabricated and altered to accommodate Customer are not returnable; otherwise, returns will be accepted prior to the Payment Date if prior authorization is obtained from Seller, which authorization shall be in Seller's sole discretion, and only if the product is in resalable condition and in the original, undamaged manufacturer's package with sales receipt or invoice. Credit will be issued, if at all, based on Customer's purchase price for the returned product less any vendor

---

[9] *See Nantong Yangzi Furniture Co. v. Indon Int'l*, LLC, No. 1:11CV142-SA-DAS, 2013 WL 214253, at *2 (N.D. Miss. Jan. 18, 2013) ("Because the contracts at issue concern the sale of goods, the Uniform Commercial Code applies in addition to the contractual provisions in place.").

[10] "Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2-602) [§ 75-2-602(1) ], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

§ 75-2-606(1).  Acceptance may also be revoked in some circumstances.  *See* §75-2-608.

restocking charges, freight, insurance, and other expenses of disposal.

[Docket 4-4] at 2.  Irby argues that, based on this term, Wood was not entitled to credit for the return because some of the items were custom made, and, thus, not returnable, because Wood did not return the surplus equipment by the "Payment Date" (defined as thirty days from the invoice date), and because Irby, regardless, did not give prior authorization for the returns.  Irby argues Wood only "attempted" to return the equipment, and more accurately "abandoned" it with Irby.  *See* [Docket 70] at 13, 20.

This Court, though, is not convinced that this contractual provision excuses Irby for at least two reasons:

**Various Sales Term Versions.**  Firstly, Irby has not shown that this return provision of the sales terms was part of the contract between Wood and Irby related to the purchase of the surplus equipment.  Reasonable factfinders may disagree about what constituted the contract at issue.  Was it the credit application establishing Wood's open account?  Was it the individual invoices for given purchases?  Was it some sort of other agreement consummated by electronic communication?  This ambiguity alone justifies denying summary judgment on these claims.

The exhibit listing the sales terms upon which Irby relies, per the metadata in its header and footer, is a printout of Irby's website as of November 2021—seven years after the 2014 credit application for Wood's account and multiple years after the invoices for the purchase of the surplus equipment were generated.  Wood argues that these current sales terms are not applicable to the surplus equipment transaction.  Despite a conclusory declaration by Irby's employee and witness that the 2021 sales terms "were the Terms and Conditions in effect when the invoices at issue in this case were sent to Wood," [Docket 87-9] at ¶7, the record does not bear out that the same 2021 sales terms even existed in 2014 or at the time of Wood's purchase of the surplus equipment.

The 2014 credit application includes a term above the signature line, reading:

> IN SUBMITTING THIS APPLICATION, I ACKNOWLEDGE
> THAT I HAVE READ, UNDERSTAND AND AGREE TO THE
> TERMS AND CONDITIONS OF SALE AS PRINTED ON THE
> REVERSE OF THIS APPLICATION AND CAN BE FOUND AT
> WWW.IRBY.COM.

[Docket 71-1] at 3.  A document entitled "Terms and Conditions of Sale" is appended to the 2014 credit application.  *Id.* at 6.  These 2014 sales terms *do not* include the returns language present in the 2021 sales terms.  These terms acknowledge Irby's "RESPONSIBILITY" for "RETURN OF GOODS AND REPAYMENT OF THE PRICE OR TO THE REPAIR AND REPLACEMENT OF NON-CONFORMING GOODS OR PARTS." *Id.*  These terms *do* include a provision reading:

> All Sales Final. All purchases are final and no Goods purchased
> from Irby shall be returned for credit without prior written approval
> and acceptance of Irby. …

*Id.*  As demonstrated by facts cited herein, above and below, evidence exists tending to show that Irby gave prior written approval, both explicitly and implicitly, in emails and texts for the return of the goods, and that Irby accepted this return.

The invoices purportedly memorializing the sale of the surplus equipment state, in fine print, "OUR PRODUCT AND SERVICES ARE SUBJECT TO, AND GOVERNED EXCLUSIVELY BY, OUR TERMS AND CONDITIONS OF SALE, WHICH ARE INCORPORATED HEREIN AND AVAILABLE AT www.irby.com/terms."  Even assuming that these invoices become part of the contract and that updated sales terms available on the website at the time are part of the parties' agreement,[11] Irby has not demonstrated that the 2021 sales terms

---

[11] Even Irby's own lopsided provisions in the 2021 sales terms that Irby is permitted to change its sales terms at-will would not necessarily be retroactive, and, regardless, require "an officer of Irby [to] approve such additional or different terms [and] affix such officer's signature approving same to any document containing such additional or different terms."  [Docket 71-1] at 6.  Irby claims that "[t]he Fifth Circuit has held that terms and conditions referenced in invoices are considered part of the contract," citing *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258,

applied at the time of these invoices for the surplus goods. Wood has pointed this Court to several other versions of Irby's sales terms that Irby filed in other proceedings in 2017, 2019, and 2020, respectively. [Docket 73]. The "return" provision upon which Irby now relies does not appear until the sales terms dated August 2020. *Id.* Irby argues that this Court should not consider these sales terms because they were not produced by Wood during discovery and are "inauthentic." [Docket 85] at 7. These prior versions were documents filed (in other proceedings) on behalf of Irby, by Irby's counsel of record in this matter, attached to Irby's pleadings.[12] For Irby to now claim to this Court that these documents are "inauthentic" and that "[t]here is no reason to think that … [they were] filed by Irby" is, under the most generous interpretation, unreasonable. [Docket 85] at 6–7. Further, since Irby is the party that seeks to use these sales terms to affirmatively preclude Wood's recovery, this Court is not inclined to demand Wood strictly prove the negative that the 2021 sales terms did not apply.

**Enforceability of Sales Terms.** Secondly, it is not settled that the contractual provisions in any of these versions of the sales terms are enforceable. Wood has argued in opposition to summary judgment that Irby's sales terms are an unenforceable "contract of adhesion" and "presumptively unconscionable." [Docket 76] at 10.

"Contracts of adhesion are those that are drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to

---

267 (5th Cir. 2011). *One Beacon*, which pertains to admiralty law, specifies other requirements, including that "[t]erms incorporated by reference will be valid so long as it is 'clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" 648 F.3d at 268.

[12] ECF No. 1-3, *Stuart C. Irby Company v. David Salsbury Electric Co., LLC et al*, No. 3:17-cv-951-DPJ-JCG (S.D. Miss. Nov. 30, 2017); ECF No. 1-4, *Stuart C. Irby Company v. Field Electric, LLC et al*, No. 3:19-cv-600-CWR-LRA (S.D. Miss. Aug 23, 2019); ECF No. 1-3, *Stuart C. Irby Company v. H&H Electric, Inc. et al*, No. 3:20-cv-571-CWR-FKB (S.D. Miss. Aug. 27, 2020).

bargain about its terms."[13]  "Unconscionability is generally defined as 'an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.'"[14]

"Substantive unconscionability is present when there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach."[15]  "Procedural unconscionability may be proved by showing 'a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms.'"[16]

Irby, in response, argues that a claim that a contract is one of adhesion is an affirmative defense and that Wood waived it by failing to assert it in his answer.  Irby cites to *Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009), for the proposition that, "[i]n the Fifth Circuit, an affirmative defense is not waived if the defendant raised the issue at a pragmatically sufficient time and [the plaintiff] was not prejudiced in its ability to respond."  [Docket 87] at 4–5.  "Irby attached its Terms and Conditions to its counterclaims," argues Irby, "[y]et Wood waited until his response to Irby's summary judgment motion to raise this issue in the record."  *Id.* at 5.  Wood, here, however, does not argue that the 2021 sales terms were a contract of adhesion as an affirmative defense to Irby's counterclaim; he makes this argument to rebut Irby's attempt to use the 2021

---

[13] *Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695, 701 (Miss. 2009) (internal quotations omitted).

[14] *Trinity Mission of Clinton, LLC v. Barber*, 988 So. 2d 910, 920 (Miss. Ct. App. 2007) (quoting *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So.2d 1202, 1207(¶ 11) (Miss. 1998)).

[15] *Id.* at 922 (quoting *Vicksburg Partners, L.P. v. Stephens*, 911 So.2d 507, 521 (Miss. 2005), *overruled on other grounds*, 14 So. 3d at 706).

[16] *Id.* at 920 (quoting *East Ford, Inc. v. Taylor*, 826 So.2d 709, 714 (Miss. 2002)).

sales terms to defeat his surplus equipment claim.  Wood did so at a "pragmatically sufficient time:" after Irby used these sales terms defensively in its summary judgment briefing. Additionally, the Mississippi Commercial Code indicates that courts may review enforceability whether "it is claimed *or* appears to the court that the contract or any clause thereof may be unconscionable."  Miss. Code Ann. § 75-2-302 (emphasis added).

The record evidence at least creates a dispute as to whether Irby's sales terms are unconscionable contracts of adhesion if they are contracts at all.  Several aspects of these sales terms raise this Court's eyebrows: they tend to be incorporated by reference via fine print and references to a website page that Irby can update at any time (and that Irby has updated, without providing this Court a version history); they are prepared entirely by Irby, a large corporation, to bind smaller customers, and expressly object to proposed terms by the customer; they purport to allow Irby to change terms at will without notice; they have indemnity clauses entirely in Irby's favor; they provide little to no recourse to a consumer who seeks remedy for non-conforming goods;[17] they purport to bind individual purchases that subcontractors like Wood may have little or no control over, or very little information about, or very little time to consider, when involved in three- or four-way arrangements with architects and general contractors; etc.

---

[17] Per the Uniform Commercial Code Comment, regarding contractual limitation of remedy:

> If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion .... Similarly, … where an apparently fair and reasonable clause because of circumstances … operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

Miss. Code Ann. § 75-2-719 (West).

This Court is not prepared to rule as a matter of law whether these sales terms as a whole—or any of the individual provisions therein—are unenforceable contracts of adhesion. This Court wishes to make that determination with more briefing and evidence on this specific issue.[18]

**Irby's Acceptance.** There is also evidence that Irby's written return policies were not enforced in practice. Matthew Henderson testified that Irby would accept returns depending on "whether it's a stocking item for us and whether [Irby] can resell it." [Docket 71-4] at 214. Henderson also stated that, if "there was gear added that was not in the plans … it would definitely be something you'd look at" and hinted that materials "not used on the job because of a mistake of the distributor" might be subject to different treatment. *Id.* at 215–17. When shown the text chain between Wood and Henderson, Henderson confirmed that, at least for some of the surplus equipment, Irby would "want to" either replace the gear with correct gear and "not charge for the replacement or credit for the return of this one." *Id.* at 222. Henderson "guess[ed]" that the delivery of the equipment at issue was due to discrepancies between "bid-day" documents and "conformed drawings." *Id.* at 225–26.

Walter Whitehead testified that the return sheet of the surplus equipment shows that materials were "returned to Irby" and confirmed that the sheets were "Irby's way to check items back into its inventory." [Docket 71-2] at 113. Whitehead confirmed that Wood "return[ed]" the items and that Whitehead "accepted those items back from him." Whitehead confirmed that he had "been sitting on those items" for "weeks or months" between Wood's return of the items and checking in the items. Whitehead testified that the reason that Wood did not receive credit for the

---

[18] "When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." Miss. Code Ann. § 75-2-302(2).

returned items was because Wood had not asked for help with some shortages on the bill of materials, so Whitehead "didn't figure he needed credit" for the surplus equipment. *Id.* at 123. Whitehead confirmed that the bill of materials would have been prepared, reviewed, and verified by Irby. *See generally id.* at 32–53. Also, Whitehead said, he denied Wood credit "to help make up some of the money [Irby] lost" on the deal due to separate issues with Irby's lighting manufacturer providing damaged lights. *See id.* at 97–108, 123.

> [Woods Counsel:] Okay. So, there it is. Irby lost $60,000 on this deal. So, it was—the decision was made not to issue credit for the items that he returned … in order to help Irby offset its losses?
>
> [Whitehead:] Correct.

*Id.* at 123 (cleaned up and objections omitted).

In light of the foregoing evidence, this Court is not convinced by Irby's theory that Wood abandoned goods, that were unreturnable under policy, at Irby's facility without permission. Certainly, a factfinder could interpret the evidence as follows: Irby ordered incorrect and unnecessary equipment and sold it to Wood. Wood, relying on Irby to order the correct equipment, paid for it. Once Wood started realizing the equipment was not needed, he got in contact with Irby, who initially told him Irby would take the goods back for credit. Wood, not wanting to complicate matters, let Irby hold off while he determined whether the equipment could still be used. Eventually, Wood returned the equipment to Irby, and Irby accepted it. Irby sat on it for a few months trying to figure out what to do with it, then checked it into inventory, providing return sheets at that time. Hurting from losing money on the deal, Irby decided it just would not pay Wood for the goods. Such a factfinder might lawfully assign liability to Irby.

**Theory of Recovery.** Irby argues that Wood abandoned his position that he was entitled to return credit and substituted a new theory that he brokered a new transaction to sell the surplus

equipment to Irby.  Irby argues that this new theory is foreclosed by the Statute of Frauds[19] because it is not memorialized by a signed contract.  Irby cites this exchange in Wood's deposition:

> [Irby's Counsel:] Why is it that C.C.W. believes it's entitled to a credit after all this time for these materials?
>
> [Wood:] I'm not sure if "credit" is actually the right term for it.  They repurchased it from me.  I owned it, it was my equipment, and I turned around and resold it back to them.  They accepted it, and they checked it into their stock, and they didn't compensate me.

[Docket 69-8] at 129.  This Court does not find that Wood abandoned his central theory of a return for credit.  Wood's layman understanding of the legal theory for his cause of action as expressed "off the cuff" during a deposition is not dispositive to his recovery.  Wood's understanding is also far from firm.  He hedges the above argument with "I'm not sure…" and earlier in the deposition expressed his desire for credit:

> [Irby's Counsel:] One issue in this current case that we're here about, as I appreciate it, is that you claim to have returned some items and that you are entitled to a credit for those returned items; is that right?
>
> [Wood:] Yes.

*Id.* at 84, 192.  Further, Wood's counsel clarified in his motion response that "Wood still asserts that he is due credit, not that this was a true 'sale of goods' governed by the U.C.C. and the Statute of Frauds."  [Docket 76] at 8.[20]

---

[19] "[A] contract for the sale of goods for the price of five hundred dollars ($500.00) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  Miss. Code Ann. 75-2-201(1).

[20] Wood argues in the alternative that, even viewing the return as a sale of goods, said resale falls under an exception to the Statute of Frauds: "(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable … (c) with respect to goods for which payment has been made and accepted or which have been received and accepted[.]"  Miss. Code Ann. § 75-2-201(3)(c).  If Wood ends up pursuing such a theory at trial, this Court will

**Unjust Enrichment / Constructive Trust.**  Irby argues that Wood's unjust enrichment / constructive trust claims[21] fail as a matter of law.  Irby argues that Wood cannot recover on an unjust enrichment claim because "there is a contract."  As discussed above, however, the record is muddy as to whether a contract governs Wood's return of surplus equipment, and, if one does, what constitutes that contract—indeed, Irby itself previously argued that no enforceable agreement exists for the return of goods.  Irby also argues that, because "Irby has derived no value" from the surplus equipment, Wood's unjust enrichment and constructive trust arguments fail.  To support this, Irby relies on Thomas Box, who, via declaration, hints that Irby will have to discard, rather than resell, the surplus equipment, and that Irby has suffered expense to restock the equipment. This declaration is insufficient to find as a matter of law that the surplus equipment is valueless. As described above, Walter Whitehead testified that he accepted the surplus equipment from Wood and checked it into inventory after "sitting on" it for "weeks or months."  This is inconsistent with Irby believing the items to be valueless.  If Irby has let the equipment languish in inventory such that it has lost value, that does not defeat Wood's contention that Irby unjustly enriched itself at

---

entertain objections based on the Statute of Frauds, whether Wood provided adequate notice of this theory, and whether his evidence establishes a "contract … valid in other respects."  *Id.*

[21] "To collect under an unjust enrichment or quasi-contract theory, the claimant must show there is no legal contract, but the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another." *Mayer v. Angus*, 83 So. 3d 444, 451 (Miss. Ct. App. 2012) (quoting *Ellis v. Anderson Tully Co.*, 727 So.2d 716, 719 (¶ 25) (Miss. 1998)).

"Constructive trust is a means by which one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs."  *Braddock L. Firm, PLLC v. Becnel*, 949 So. 2d 38, 48 (Miss. Ct. App. 2006) (quoting *In re Estate of Horrigan*, 757 So.2d 165, 170(¶ 25) (Miss. 1999)).  "It is the relationship plus the abuse of confidence that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." *Id.* (quoting *Thornhill v. Thornhill*, 905 So.2d 747, 753(¶ 18) (Miss. Ct. App. 2004)).

Wood's expense.  Ultimately, Irby did not inform Wood that it would not credit him until Irby had already accepted property from which Wood otherwise could have attempted to derive value.

      **Promissory Estoppel.**  Even if Irby would derive no benefit or consideration for agreeing to take back the surplus equipment, Wood has also levied a promissory estoppel claim.[22]  Irby also argues that Wood's promissory estoppel claim fails as a matter of law.  Irby argues that Wood cannot identify a promise Irby made to Wood with the intent that Wood rely on that promise, or that refusing to honor any promise would result in injustice.  In his opposition, Wood claims that "Wood and Whitehead discussed the return of the gear for credit and Whitehead made an oral promise to Wood that he would receive credit." [Docket 76] at 4.  Wood does not provide a record citation for this proposition, and it is unclear what evidence supports it.  Wood testified at deposition that only Matt Henderson promised a return credit, referring to the text messages.  That said, the text messages and emails at least create a dispute of material fact as to whether Irby promised to credit Wood for at least some of the surplus equipment.  Given that Irby allowed Wood to return the materials *before* telling him he would not be credited, the claim for promissory estoppel survives summary judgment.

      **Value of Surplus Equipment.**  Irby also argues that Wood cannot prove damages because he has not designated a damages expert or produced any admissible evidence of the value of the surplus equipment.  Liquidated damages could simply be the price Wood paid for the surplus equipment.[23]  Wood declares, however, that Irby invoiced the surplus equipment "in several

---

[22] "[T]he elements of promissory estoppel are: (1) the making of a promise, even though without consideration, (2) the intention that the promise be relied upon and in fact is relied upon, and (3) a refusal to enforce it would virtually sanction the perpetuation of fraud or would result in other injustice." *Beasley v. Sutton*, 192 So. 3d 325, 335 (Miss. Ct. App. 2015) (quoting *Thompson v. First Am. Nat'l Bank*, 19 So.3d 784, 788 (¶ 19) (Miss. Ct. App. 2009).

[23] Where a "buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved," the buyer may "recov[er] so much of the price as has been paid."  Miss. Code

different 'lots' which included other items that [Wood admits] were needed and conforming, but none of the goods [was] individually itemized with prices; rather, the invoices showed several total 'lot prices' for each of the 'lots.'" [Docket 127-1] at 18. Irby has not provided the price or value of these items.[24]

Wood's contentions of what he is owed for the surplus goods have vacillated over time, and Irby has asserted that his estimations are unreliable and inadmissible. This Court discusses the estimates and their admissibility in greater detail in its discussion of [Docket 92] Irby's motion *in limine*, below. To win a summary judgment that Wood cannot recover damages (assuming liability), however, Irby would need to show that it "cannot be … disputed" that there are no damages—that the surplus equipment is valueless—either by its own evidence or by demonstrating that Wood "cannot produce admissible evidence to support the fact" that the surplus equipment has some value. Fed. R. Civ. P. 56(c)(1)(B). Irby cannot meet this burden. It is undisputed Wood paid for the surplus equipment, and indeed, Irby employees texted Wood that Irby could pick back up some of the equipment "to credit."

---

Ann. § 75-2-711(1); *see also* [Docket 71-1] at 6 (In the 2014 credit application sales terms, Irby acknowledging responsibility for "REPAYMENT OF THE PRICE … OF NON-CONFORMING GOODS OR PARTS.").

[24] Wood claims Irby should be faulted for objecting to and refusing to produce documents in response to Wood's discovery request seeking "all documents which evidence or tend to evidence Irby's costs for the electrical materials and items 'on the gear portion' that Plaintiff Wood returned to Irby[.]" [Docket 71-11] at 6. This request, however, does not clearly seek *the price* Wood paid for the goods—even if that is what Wood intended "Irby's costs" to mean—and Wood apparently never moved to compel responsive documents, despite being granted discovery extensions.

The parties nonetheless agree that Wood, the nonmovant, did not receive the prices in discovery and that the prices cannot be entirely derived from the "lot" prices. *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").

**Consequential Damages.**   Wood also seeks consequential damages, including delay damages and lost profits.   Irby argues that Wood cannot recover delay damages because the 2021 sales terms included an indemnity clause stating:

> LIMITATIONS OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PARTIES AGREE THAT IN NO EVENT SHALL SELLER BE LIABLE TO CUSTOMER … FOR: (A) ANY SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, LIQUIDATED, INCIDENTAL, OR INDIRECT DAMAGES, INCLUDING, WITHOUT LIMITATION, FOR LOSS OF PROFITS, USE, TIME, DATA, OR INCOME …

[Docket 4-4] at 4.   Unlike the return provision addressed above, indemnity clauses appear in various versions of the sales terms and very well could have been applicable to Wood's purchase of the surplus equipment.   Until Irby can prove this, and until this Court finds these sales terms— and the indemnity clause specifically—enforceable,[25] judgment is not proper on that basis.

This Court, however, notes that Wood has not specifically pleaded consequential damages in his complaint.   The Fifth Circuit defers to state law in determining whether consequential damages must be pled. *See Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, 759 F. App'x 280, 297 (5th Cir. 2019); *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 275 (5th Cir. 2012).   Under Mississippi law, consequential damages are special damages that must be specifically pled.   *See Puckett Mach. Co. v. Edwards*, 641 So. 2d 29, 37 (Miss. 1994) (citing M.R.C.P. 9(g)).   Wood argues that his consequential damages are new and were sustained during the pendency of this case but has not moved to amend his complaint to reflect this (nor provided law justifying his decision not to move to amend).   Irby has had some opportunity to take discovery on these contentions, with notice that

---

[25] "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."  Miss. Code Ann. § 75-2-719.

Wood seeks lost profits and delay damages at least as early as Wood's deposition—but this was later in the litigation.  <u>This Court will defer ruling on this matter and will give the parties the opportunity to submit three-page letter briefs on this issue within two weeks of the entry of this order, so that this can be resolved before trial.</u>

This Court **denies** summary judgment on Wood's claims related to the surplus equipment, except to **defer ruling** on the question of whether Wood may recover consequential damages.

### 3.   [Docket 71 *as amended by* 156] Wood's Motion for Partial Summary Judgment

Wood moves for partial summary judgment, seeking a declaration that Irby is "liab[le] to Wood for the surplus gear and materials that Wood returned to Irby in March of 2021 in expectation of credit," for "a minimum amount of $16,702.99 and up to $42,052.99" for the surplus equipment, and credits/offsets for the purported unrefunded sales taxes and underapplied checks. [Docket 156] at 3.   As described in greater detail above, disputes of material fact exist as to the amount, propriety, and entitlement of each of these claims and defenses.  Viewing the evidence and resolving inferences in favor of Irby, Wood's motion must be **denied**.

This Court notes that Wood, via his briefing throughout this case, apparently seeks for his suit to be treated as an "open account" suit, where he is entitled to credit as affirmative damages for apparent wrongs that he did not plead.  Further, Wood argues that he discovered additional torts towards the end of discovery and now is entitled to recover based on entirely new causes of action, such as conversion.[26]  To date, however, Wood has not moved to amend his complaint, which is what Wood must do if he wants this Court to consider new causes of action.

---

[26] Conversion—otherwise known as "civil theft"—"requires an intent to exercise dominion or control over goods which is inconsistent with the true owner's right."  *McGee v. Comprehensive Radiology Servs., PLLC*, 340 So. 3d 328, 333 (Miss. 2022) (quoting *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987)).

### C. Motions *in Limine*

Irby has filed twelve motions *in limine*, which this Court takes in turn.

1. Legal Standards

Motions *in limine* "allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *Harkness v. Bauhaus U.S.A., Inc.*, No. 3:13-CV-00129-DMB, 2015 WL 631512, at *1 (N.D. Miss. Feb. 13, 2015) (quoting *Wechsler v. Hunt Health Sys., Ltd.*, 381 F.Supp.2d 135, 140 (S.D.N.Y. 2003)). "Evidence should not be excluded *in limine* unless it is clearly inadmissible on all potential grounds." *Id.* (italics added) (quoting *Fair v. Allen*, No. 09-2018, 2011 WL 830291, at *1 (W.D. La. Mar. 3, 2011)). "Though the granting of a motion *in limine* 'does not preclude the party sponsoring the evidence from revisiting the issue at trial,' the issue must be raised 'outside the jury's presence.'" *United States v. Cockerham*, No. 5:21-CR-06-DCB-ASH, 2024 WL 1184419, at *1 (S.D. Miss. Mar. 18, 2024) (quoting *Parker v. Tyson Foods, Inc.*, 499 F. Supp. 3d 297, 299 (S.D. Miss. 2020)).

Many of Irby's motions *in limine* argue that evidence and argument should be excluded because it risks "unfairly prejudice[ing] Irby and confus[ing] the issues at trial." *E.g.,* [Docket 91] at 3. Courts may exclude otherwise relevant evidence[27] if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "'Unfair prejudice' within its context means an undue tendency to suggest

---

[27] The Federal Rules of evidence provide that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. While "[i]rrelevant evidence is not admissible," relevant evidence is generally admissible unless "the United States Constitution; a federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 402.

decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note. This Court has applied this balancing test between probative value and "the danger[s]" enumerated in Rule 403, where called for by these motions.

2. [Docket 90] Argument and Evidence Regarding Returning the Surplus Equipment

Irby argues that "Wood should not be permitted to present evidence or argument that he returned the [surplus] equipment to Irby for a credit in support of his claims or his defenses to this action" because Wood was not allowed to make a return under Irby's 2021 sales terms. [Docket 91] at 2. As described above, the applicability and enforceability of these sales terms are not established,[28] and Wood has evidence that Irby, regardless, accepted the returned goods. **Denied.**

3. [Docket 92] Expert Testimony and Evidence or Argument Attempting to Assign a Value to the Surplus Equipment

Irby requests that this Court "exclude evidence or argument in the form of expert testimony from Wood" and preclude Wood "from offering any argument or testimony about the valuation of the [surplus] equipment." [Docket 93] at 8–9. As discussed above, the exact prices of the returned surplus equipment is obscured by the equipment being invoiced along with other unreturned items in "lot prices." Irby notes that Wood did not designate any expert (including Wood himself) for damages and argues that Wood's own estimations of the value of the surplus equipment is the domain of expert testimony. Irby also argues that the estimations are unreliable. Wood admits that he does not intend to present expert testimony but argues that his estimates are reliable.

Wood, to his complaint, attached a list of the surplus equipment, with a low-to-high price range next to each. [Docket 1-1] at 11. In total, Wood estimated the surplus equipment "to be

---

[28] This Court recognizes the difficulty presented if the jury were to find the return was prohibited by a contract this Court later finds unenforceable; the parties and this Court should aim to raise and resolve this issue at a hearing outside the presence of the jury before or during trial.

worth between $16,708.39 if it is valued as used and/or refurbished, and $42,053.49 if a new value is used." *Id.* at 3.  At deposition, he testified that he derived these values by searching for the equipment on the internet and averaging prices advertised to the public across a several different websites—but could not recall specifics and apparently did not preserve this internet research.

Wood later claimed he is entitled to $15,654.51, which he has described as what he "was actually charged for the products." [Docket 69-8] at 93.  Wood purportedly calculated this figure by considering "several of the items [that] had prices reflected in Irby's invoices" and "contemporaneous instances where Irby sold [Wood] identical goods at an itemized price on other projects," and "multipl[ying] the total lot price by the percentage of surplus goods contained in the particular lot." [Docket 127-1] at 18–19.  Wood indicated at deposition that he does not have this all written out and may have used his experience and more internet research to help in this calculation.

Irby argues that Wood attempts to present an opinion as to the value of the surplus equipment.  "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [expert testimony]."  Fed. R. Evid. 701.  Irby argues that Wood's estimates fail all three requirements.

Federal courts are split in their treatment of nonexpert opinions on value, especially those based in part on internet research.  Courts that decline to admit such evidence tend to be concerned with unreliability.[29]  Courts that accept the evidence give more credence to valuations by witnesses

---

[29] *See, e.g.*, *Cheyenne River Sioux Tribe v. United States*, No. 20-126, 2024 WL 3819103, at *1 (Fed. Cl. Aug. 14, 2024) (finding that a party's "proof of damages was entirely unconvincing, dependent on construction costs … and rental values derived from cursory internet searches);

who owned the property or have professional or personal experience related to it.  These courts apparently interpret the witness' experience as a unique perspective on the property in question, rather than as expertise underlying a methodological valuation in contravention of Rule 701.[30]

---

*Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1259 (N.D. Ill. 2015), *aff'd*, 842 F.3d 1010 (7th Cir. 2016) ("Sigmatron offers inadmissible evidence in an attempt to place a value on the lodging, proffering real-estate listings from the internet, … for a one-bedroom apartment in the area of Chicago where Gracia stayed with her sister. Aside from the inadmissibility of the listings, no explanation is provided to support using the value of an entire one-bedroom apartment[.]");

*In re Wcislak*, 417 B.R. 24, 28 (Bankr. N.D. Ohio 2009) ("[T]he only corroborating evidence Mr. Wcislak presented to substantiate the base value of his vehicle were the 'sales offers' he gathered from the internet. And while such evidence is not necessarily inadmissible, its evidentiary weight is questionable, particularly, in light of the evidence offered in rebuttal[.]").

[30] *See, e.g.*, *Federico v. Lincoln Mil. Hous. LLC*, No. 2:12-CV-596, 2015 WL 12765993, at *6 (E.D. Va. Nov. 24, 2015) (The court permitted testimony of the value of destroyed personal property, where "the value of each item on [plaintiffs'] list was merely estimated by [a plaintiff], who did research on the internet."  The court reasoned that "[b]efore seeing what specific pieces of evidence that Plaintiffs will introduce to establish the value …, the Court cannot determine what evidence will be admissible." The court noted that "the common law majority rule is that a property owner is competent to testify as to the value of his or her own property."  The court cited the Advisory Committee Notes to Fed. R. Evid. 701, which state that "[s]uch opinion testimony is admitted not because of experience, training or specialized knowledge ... but because of the particularized knowledge that the witness has by virtue of his or her position in the business.'" (cleaned up));

*Dean Foods Co. v. Consol. Freightways Mtr.*, 29 F. Supp. 2d 495, 496 (N.D. Ill. 1998) (The court declined to strike an affidavit containing the value of a machine estimated by the president of the company who made it.  The court reasoned: "I think there is a sufficient basis for the witness' opinion as to value. It is true that he did not support it with records from other sales, but he is not an expert whose opinions are based on a formal study of the market. They are based on his direct participation in the market. I agree … that the witness was analogous to a treating physician rather than an examining expert.");

*In re Salazar*, No. 1:21-BK-11467-MT, 2022 WL 2079724, at *4 (Bankr. C.D. Cal. June 9, 2022) (quoting *In re Cocreham*, 2013 WL 4510694, *3-*4 (E.D. Cal. Aug. 23, 2013), ECF doc. 40, attach. 2.) ("… Debtor … present[ed] only his personal declaration as to the value of the real property. Specifically, Creditor attacked Debtor's use of internet appraisal websites to form his opinion. … While a lay debtor's opinion of value as homeowner may not be very persuasive when weighed against a comprehensive appraisal, where there is no other competent evidence offered in opposition, however, even an owner's lay opinion as to value under Fed. R. Evid. 701 may carry the day." (internal quotations omitted));

*See also Com. Credit Grp., Inc. v. Falcon Equip., LLC of Jax*, No. CIV. 3:09CV376-DSC, 2010 WL 144101, at *12 (W.D.N.C. Jan. 8, 2010) (permitting nonexpert opinion testimony as to the

Ultimately, this Court finds that Wood's first estimation of value ($16,708.39 to $42,053.49) is too unreliable to be helpful to the jury, and hereby excludes it. The internet advertisements for the sale of similar goods are not necessarily hearsay. The prices on these advertisements are more accurately verbal acts—offers for sale—rather than statements offered for their truth value. Wood, though, did not record his work or process and cannot remember the source of the information. Further, the prices offered to members of the general public are likely higher than what Irby would be able to offer as a distributor negotiating a competitive bid package. Also, Wood would have done this research years later, when prices may have risen.

This Court will not exclude Wood's second estimation ($15,654.51). Based on Wood's explanation, this figure reflects his best effort to understand what he actually paid for the surplus equipment and is based on more accurate and rigorous proof (examining invoices for the surplus equipment and other contemporaneous purchases of the same or similar goods). While this is not the best evidence of the price paid, it is the best available evidence. Even if Wood has relied on his professional experience and some internet research to verify or refine this estimation, this Court does not find his estimation violative of Rule 701. Wood, however, will be required to explain his process for arriving at this figure with as much detail as possible—and Irby will be given a fair chance to attack and/or rebut this figure—so that the jury can accurately weigh the persuasiveness.

Otherwise, Wood will be permitted to inquire as to facts to prove up his damages claim and will be able to present the "lot prices" to the jury for their consideration. **Granted-in-part** and **denied-in-part**.

---

value of a piece of machinery by someone familiar with the machine; but finding an internet printout which "merely corroborat[ed]" the value inadmissible).

4.  [Docket 94] Argument and Evidence in Excess of Contract Limits

Irby argues that Wood should not be able to present evidence of damages which Irby alleges that Wood cannot recover under Irby's sales terms (such as punitive damages, lost profits, and delay damages).  Irby argues that this evidence would risk confusing the jury and unfairly prejudicing Irby.  As discussed above, it is unclear which sales terms are applicable in this case. Further, this Court may determine that the indemnity clause is an unenforceable clause of a contract of adhesion.  This Court, however, is cognizant of the fact that these categories of damages appear to be unpled.  This Court defers ruling as to whether these damages are indeed legally available, so it will deny this motion without prejudice.[31]  As to consequential damages, this Court intends to resolve this issue before evidence is presented to the jury.  As to punitive damages, the trial will be bifurcated (as discussed below regarding [Docket 112(E)]), thus eliminating the potential dangers of prejudice and confusion.  **Denied.**

5.  [Docket 96] Value of the Surplus Equipment

Irby again argues that Wood cannot establish the value of the surplus equipment, for reasons previously discussed, and thus seeks to prevent Wood from even trying.  If Wood can offer probative and admissible evidence, this Court will accept it.  **Denied.**

6.  [Docket 98] Argument and Evidence Regarding Alleged Discovery Failures, Discovery Disputes, or Motions in Limine

Irby argues that Wood should not be permitted to offer evidence of purported discovery disputes or motion practice by the litigants to argue that Irby did not fulfill discovery obligations

---

[31] "Evidentiary rulings, especially those addressing broad classes of evidence, should often be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in proper context." *Fair v. Allen*, No. CIV.A. 09-2018, 2011 WL 830291, at *1 (W.D. La. Mar. 3, 2011) (citing *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir.1975)).

or is hiding evidence.  Wood apparently does not oppose the motion generally but is concerned that it would preclude presenting discovery requests and responses to the jury.  Interrogatory requests and answers are not generally improper evidence (but are subject to objection). Otherwise, this Court does not see it relevant or proper to present discovery disputes (including objections or refusals to produce documents) or motion practice to the jury.  **Granted.**

7.  [Docket 100] Argument or Evidence Regarding Sales Tax Exemption

Irby argues that Wood should not be allowed to present evidence regarding sales tax exemption because it is unpled.  As discussed above, Wood pled an affirmative defense of set-off. Improperly assessed sales tax would thus be relevant to determining the amount Wood owes Irby on Irby's counterclaim.  Irby also argues that Wood cannot present any competent evidence of a sales tax exemption and thus seeks to prevent Wood from even trying.  If Wood can offer probative and admissible evidence, this Court will accept it.  **Denied.**

8.  [Docket 102] Argument or Evidence of Payment Application to Wood's Account

Irby argues that Wood should not be allowed to present evidence regarding underapplied payment on Wood's account because it is unpled.  As discussed above, Wood pled an affirmative defense of set-off.  Underapplied checks would thus be relevant to determining the amount Wood owes Irby on Irby's counterclaim.  Irby also argues that Wood cannot present any competent evidence of underapplied payment and thus seeks to prevent Wood from even trying.  If Wood can offer probative and admissible evidence, this Court will accept it.  **Denied.**

9.  [Docket 104] Argument and Evidence Regarding Unpled Claims

Irby again argues that Wood should not be able to offer evidence or argue unpled claims. Irby specifically argues that:

> He did not plead a claim that 1) Irby had an open account established with Wood in which Wood extended Irby credit (it did not); 2) Irby misapplied or improperly assessed sales taxes to Wood's account;

3) Irby misapplied payments to Wood's account; or 4) any other claim unrelated to the surplus equipment.  He also did not allege a conversion claim.

[Docket 105] at 4.  Wood pled the affirmative defense of set-off, so he may argue that Irby owes him credit on his open account for returned goods, improperly assessed sales taxes, and misapplied payments to reduce Irby's recovery against Wood on Irby's counterclaims.  Wood, however, may not argue that he is entitled to damages in excess of what he is owed on his affirmatively pled claims.  Wood also may not argue that he is suing Irby for "conversion" or "civil theft" (nor will this Court issue a jury instruction defining conversion) because this claim was never pled; however, this Court notes that the predicate facts under which Wood would use to prove conversion are likely relevant to prove his pled claims.  **Granted-in-part** and **denied-in-part.**

10. [Docket 106] Argument Regarding Irby's Actions with the Surplus Equipment

Irby requests that this Court "exclude any evidence or argument regarding what Irby did with the surplus equipment," arguing that "Wood did not obtain any information in discovery about what happened to [the surplus equipment] after his employees left [it] at Irby's facility [and] cannot cure that problem by speculating at trial."  [Docket 107] at 2, 3.  Certainly, speculation is inadmissible, [32] but "[t]he purpose of motions *in limine* is not to re-iterate matters which are set forth elsewhere in the … Rules of Evidence.  *Maggette v. BL Dev. Corp.*, No. 2:07-CV-181-M-A, 2011 WL 2134578, at *4 (N.D. Miss. May 27, 2011).

Irby's subsequent actions, however, are at least relevant to determining whether Irby accepted the return and whether it was unjustly enriched by the return.  Wood did, in fact, solicit some information about what happened with the goods at least from the deposition testimony of

---

[32] Speculation is prohibited because "lay testimony must arise from the witness's 'personal knowledge of the matter' and be 'rationally based on the witness's perception.'"  *Hamilton v. AVPM Corp.*, 593 F. App'x 314, 319 (5th Cir. 2014) (quoting Fed. Rs. Evid. 603, 701).

Walter Whitehead, which Wood intends to offer into evidence, per the proposed joint pretrial order.  Also, per that order, Irby will call Thomas Box as a witness, who purports to know what happened with the surplus equipment, and Wood may call John D. ("J.D.") Allen, one of his employees who dropped off the equipment.  **Denied.**

11. [Docket 108] Argument and Evidence Regarding Wood's Claim He Was Approved to Return or Sell the Surplus Equipment to Irby or That He Was Promised a Credit

Irby requests this Court to "exclude any argument or evidence from Wood regarding alleged approval from anyone with Irby to return or sell the surplus equipment to Irby or that he was promised a credit" because Wood "has no admissible evidence supporting that contention." [Docket 109] at 2.  As previously discussed, there is record evidence to suggest that Irby employees may have invited or promised a return for credit.  Wood's counsel could properly argue the return was approved, and Wood himself could testify as to his understanding of whether the return was approved—but both would require admissible foundation.   If Wood can offer probative and admissible evidence, this Court will accept it.  **Denied.**

12. [Docket 110] Plaintiff/Counter-Defendant's Assertion of Unpled Affirmative Defenses

Irby requests that this Court preclude "Wood from presenting evidence or argument that the Sales Terms are illegal or unconscionable or that they are a contract of adhesion and from presenting evidence or argument regarding any other affirmative defense not raised in Wood's answer to Irby's counterclaims." [Docket 111] at 1–2.  As previously discussed, Wood has argued unconscionability primarily to rebut Irby's defense to Wood's claim, not as an affirmative defense (and raised the claim at an appropriate time), and this Court may review the issue, regardless.  This Court notes that unconscionability is a question of law, not a question of fact for the jury.  Miss. Code Ann. § 75-2-302(2) Uniform Commercial Code Comment 3.  This Court, thus, may hear this evidence outside the jury's presence.  **Granted-in-part** and **denied-in-part.**

13. [Docket 112] Omnibus Motion *in Limine*

Irby's "omnibus" motion contains subparts (A) through (K).  This Court takes each in turn.

    *a.  Financial Condition of Parties.*

Irby requests that Wood "be precluded from making any reference or argument concerning the financial condition, wealth, or poverty of the parties." [Docket 113] at 1.  Irby also requests a prohibition on evidence or argument regarding "the size" of Irby.  *Id.*  While it would be generally improper for Wood to present evidence of Irby's wealth "to appeal only to the jury's sympathy" or paint Irby as a bad actor, the relative size and financial status of the parties could be relevant for other purposes.  *See Hankins v. Ford Motor Co.*, No. 3:08-CV-639-CWR-FKB, 2012 WL 174793, at *7 (S.D. Miss. Jan. 20, 2012).  For example, depending on the proof, such evidence could be probative in determining punishment, explaining unequal bargaining power between the parties, or explaining errors and omissions in the parties' transactions caused by bureaucracy or corporate complexity.  As such, this Court will deny, without prejudice, this blanket motion.  **Denied.**

    *b.  Irby and its Counsel.*

Irby requests that Wood "be precluded from making any reference to the size, location, specialization, representation, or other work of Irby or its counsel." [Docket 113] at 2.  Irby argues that "facts about other clients and facts about defense counsel's law practice (including, but not limited to, the number of attorneys in their law firm, the location of their offices, and the substantive practice areas of their firm) cannot tend to prove or disprove any issue in this case."  Wood does not contest this.  This Court agrees that facts about defense counsel are irrelevant and substantially more prejudicial than probative with respect to liability and compensatory and

punitive damages in this case.[33]   However, including for the reasons listed above, "the size, location, … specialization, or other work of *Irby*" may be relevant and admissible.   **Granted-in-part and denied-in-part.**

c.   *Absent or Probable Witnesses.*

Irby requests Wood make "no mention or suggestion … as to the probable testimony of a witness who is absent, unavailable, or not called to testify in this cause; and that no comment be made as to the failure of any party to call as a witness any person equally available to both parties." [Docket 113] at 3.  Irby cites to Rules 801 and 802 of the Federal Rules of Evidence, but these deal with hearsay evidence.   This Court will entertain objections to hearsay at trial, and the parties are cautioned not intentionally to offer or make reference to evidence it knows is inadmissible hearsay; however, this Court will not enter a blanket order precluding any evidence of testimony by unavailable or absent witnesses,[34] nor will it rule that it is always improper to comment on a party's failure to call a certain witness.[35]   This Court will hear contemporaneous objections at trial. **Denied.**

d.   *Settlement Negotiations.*

Irby requests Wood "be precluded from making reference to settlement negotiations." [Docket 113] at 4.  Wood does not oppose.  Rule 408 of the Federal Rules of Evidence prohibit evidence of settlement negotiations used to "prove or disprove the validity or amount of a disputed

---

[33] This Court withholds ruling as to whether any such facts would be relevant to determining attorney fees and litigation costs.

[34] For example, Rule 804 defines when a "declarant is considered to be unavailable as a witness" and sets forth hearsay exceptions for the statements of such declarants.  Fed. R. Evid. 804.

[35] Irby has not presented authority or reasoning for why it would be improper for a party to comment on another party's failure to call a witness material to an issue on which the latter party bears the burden of proof.

claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408.  This Court, though, may "admit this evidence for another purpose, such as proving a witness's bias or prejudice [or] negating a contention of undue delay."  *Id.*  Should a party seek to use evidence of settlement offers or negotiations for a permitted purpose, it should first raise this intent with this Court outside the presence of the jury.  **Granted.**

     *e.  Punitive Damages.*

Irby requests Wood "be precluded from improperly and prematurely making punitive damage arguments."  [Docket 113] at 4.  Irby cites to a Mississippi Rule of Civil Procedure that purports to require a trial be bifurcated between a jury determination of compensatory damages and a determination of punitive damages.  *Id.*[36]  This Court interprets Irby as also making an *ore tenus* motion to bifurcate proceedings.  Wood does not oppose this request.  While this Mississippi rule is a mixed statute governing both damages law and procedure, this Court will defer to it generally, agreeing that such a bifurcation would prevent the introduction of prejudicial evidence largely irrelevant to liability and compensatory damages from influencing the factfinder on those

---

[36] "(1) In any action in which punitive damages are sought:

    (a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

    (b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.

    (c) If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact.

    (d) The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount."  Miss. Code Ann. § 11-1-65 (West).

issues.  This Court will exclude evidence relevant only to punitive damages from the initial phase of the trial.  *See Sun State Oil, Inc. v. Pahwa*, No. 3:18-cv-619-KHJ-FKB, 2021 WL 2877907, at *2 (S.D. Miss. July 8, 2021).  **Granted.**

    *f.  Irby's Motions to Exclude Evidence.*

Irby requests Wood be "precluded from making any reference during this trial to any request by [Irby], including this Omnibus Motion *in Limine* and other motion[s] *in limine*, to exclude certain evidence."  [Docket 113] at 4.  Wood does not oppose this request.  This Court agrees with Irby that Irby's motions to exclude evidence are facially irrelevant in the trial of this matter and should not be presented to the jury.  **Granted.**

    *g.  Ethical or Moral Obligation.*

Irby raises concerns that Wood will "attempt to elicit testimony from witnesses who will testify as to their experiences and opinions with respect to [Irby's] conduct and attempt to raise questions about or make reference to perceived ethical or moral obligations on the part of [Irby]." [Docket 113] at 4.  Irby believes these witnesses "may attempt to cater to the jury's emotions by offering their opinion that Defendant's conduct rises to such a level as to warrant the imposition of punitive damages."  *Id.* at 4–5.  Wood proffers he "absolutely intends to offer evidence that Irby's former branch man[a]ger[,] Walter Whitehead[,] acted intentionally to harm Wood when [he] refused to issue credit to Wood for the returned surplus goods to help Irby unlawfully recover some portion of its $60,000-$80,000 in losses sustained over the course of the STEAM Project" and that "Irby willfully and wantonly breached its duty of good faith and fair dealing and maliciously converted Wood's property." [Docket 133] at 2–3.  Wood clarifies he "does not intend to elicit any 'lay witness opinion testimony' on this issue.  *Id.* at 3.  To the extent Wood seeks to offer evidence of witness's factual "experiences" with Irby to demonstrate wrongdoing or liability, this Court does not see a basis for blanket exclusion—Irby can object on a case-by-case basis.

Based on Wood's stipulation, this Court will exclude irrelevant and improper lay witness opinions about whether Irby acted immorally or unethically. **Granted-in-part** and **denied-in-part.**

> h. *Religious References or Argument.*

Irby's section requests Wood be "precluded from offering any religious references or argument at any stage of the trial." [Docket 113] at 5. This Court has been presented nothing to suggest that religion is relevant to this matter, and, indeed, it would be improper for Wood or Irby to use religious argument to bolster its case or attack its opponent's case. Further, "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." Fed. R. Evid. 610. In this section, Irby also seeks to preclude "Golden Rule" arguments—arguments for the "jury to place themselves in the plaintiff's position and do unto him as they would have him do unto them." [Docket 113] at 5 (quoting *Stokes v. Delcambre*, 710 F.2d 1120, 1128 (5th Cir. 1983)). This Court agrees this argument would be improper.

Irby, within the same section, goes on to "anticipat[e] that [Wood] may attempt to solicit testimony" regarding his own character. [Docket 113] at 5. Character evidence[37] is a complex and nuanced area of law which is highly context-dependent. Irby has not explained what improper character evidence it expects Wood will offer, and this Court is not comfortable with a blanket preclusion on all evidence of qualities or character. Irby may levy appropriate objections at trial, as necessary. **Granted-in-part and denied-in-part.**

> i. *Ethical or Moral Obligation.*

Irby appears to have duplicated this request. *See supra*.

---

[37] Generally, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).

    *j.   Resale of Surplus Equipment*

Irby argues that "this Court should preclude Wood from presenting any evidence, statement, or argument that he entered into a contract with Irby in which Wood agreed to sell Irby the surplus equipment" because such a contract would violate the Statute of Frauds. [Docket 113] at 7. As previously discussed, this does not appear to be Wood's primary theory of recovery, but Wood has proffered an exception to the Statute of Frauds. Wood would still need to make proper arguments supported by admissible evidence, however, that such a contract existed. **Denied.**

    *k.   Terms and Conditions.*

Irby argues that "Wood should be precluded from presenting any evidence, argument, or statement regarding any of Irby's alleged prior terms and conditions." [Docket 113] at 8. Irby once again argues that the 2021 sales terms "were in effect during the time Irby sent the invoices to Wood," *id.* (citing [Docket 83-2] at ¶ 6), and that "Irby contested the accuracy and authenticity of the presented documents alleged to be Irby's prior terms and conditions," *id.* Irby argues the prior terms and conditions are "irrelevant" and unduly "misleading" and "confusing." *Id.* As already discussed, this evidence is relevant to determining the contractual terms to which Wood and Irby agreed and which underly the controversies in this suit. Wood has presented evidence that the terms and conditions changed over the course of the various events at issue in this suit; it would be *more* misleading *not* to develop an accurate chronology of Irby's terms and conditions. Wood may attempt to foundation and offer the various versions of these terms and conditions at trial, and Irby may attempt to object to (or contest) them. **Denied.**

### III.    CONCLUSION

**IT IS ORDERED** that, in accordance with the foregoing opinion:

1. [Docket 69] is **GRANTED-IN PART, DENIED-IN-PART**, and ruling is **DEFERED-IN-PART**;

2. [Docket 71 *as amended by* Docket 156] is **DENIED**;

3. [Docket 90] is **DENIED**;

4. [Docket 92] is **GRANTED-IN PART** and **DENIED-IN-PART**;

5. [Docket 94] is **DENIED**;

6. [Docket 96] is **DENIED**;

7. [Docket 98] is **GRANTED**;

8. [Docket 100] is **DENIED**;

9. [Docket 102] is **DENIED**;

10. [Docket 104] is **GRANTED-IN PART** and **DENIED-IN-PART**;

11. [Docket 106] is **DENIED**;

12. [Docket 108] is **DENIED**;

13. [Docket 110] is **GRANTED-IN-PART** and **DENIED-IN-PART**; and

14. [Docket 112] is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**SO ORDERED this the ___23rd___ day of _September_, 2024.**

**/s/ HENRY T. WINGATE**
**UNITED STATES DISTRICT COURT JUDGE**